Joseph G. Pia, joe.pia@padrm.com (9945)
Tyson B. Snow, tsnow@padrm.com (10747)
Sara E. Payne spayne@padrm.com (14008)
**PIA ANDERSON DORIUS REYNARD & MOSS**
222 S. Main Street, Suite 1830
Salt Lake City, UT  84111
Telephone:  (801) 350-9000
Facsimile: (801) 350-9010
*Attorneys for Plaintiff*

---

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ITN FLIX, LLC, a Utah limited liability company;<br>Plaintiff,<br><br>v.<br><br>GLORIA HINOJOSA, an individual;  AMSEL, EISENSTADT, & FRAZIER: A TALENT & LITERARY AGENCY, INC., a California corporation; ROBERT RODRIGUEZ, an individual; TROUBLEMAKER STUDIOS, L.P., a Texas limited partnership; EYA PRODUCTIONS, INC., a Texas corporation; MACHETE KILLS, LLC, a Texas limited liability company; MACHETE'S CHOP SHOP, INC., a Texas corporation; OVERNIGHT, LLC, a Delaware limited liability company; ALDAMISA ENTERTAINMENT, LLC, a California limited liability company; 1821 PICTURES, INC., a California corporation; QUICK DRAW PRODUCTIONS, LLC, a Texas limited liability company; OVERNIGHT FILMS, LLC*,* a Delaware limited liability company; OPEN ROAD FILMS, LLC, a Delaware limited liability company; and DOES 1-100.<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br><br><br>**(JURY TRIAL DEMANDED)**<br><br><br>Case No. 1:13-cv-00022-RJS<br><br><br>Judge: Robert J. Shelby |

Plaintiff ITN FLIX, LLC respectfully submits this First Amended Complaint ("*Complaint*") and alleges and complains against defendants ("*Defendants*") as follows:

## PARTIES

1.      Plaintiff ITN FLIX, LLC, formerly ITN, LLC (the "*Plaintiff*"), is now, and was at all relevant times, a Utah limited liability company, duly authorized and licensed to conduct business in the state of Utah, with its principal place of business in North Salt Lake, Utah.

2.      Defendant GLORIA HINOJOSA ("*Hinojosa*") is an individual residing in the state of California.

3.      Defendant AMSEL, EISENSTADT, and FRAZIER: A TALENT & LITERARY AGENCY, INC. ("*Talent Agency*") is a California corporation with a principal place of business in Los Angeles, California.

4.      On information and belief, Defendant ROBERT RODRIGUEZ ("*Rodriguez*") is an individual residing in Austin, Texas.

5.      On information and belief, Defendant TROUBLEMAKER STUDIOS, L.P. ("*Troublemaker Studios*") is a Texas limited partnership with its principal place of business in Austin, Texas.

6.      On information and belief, Defendant EYA PRODUCTIONS, INC., doing business as Rodriguez International Pictures ("*Rodriguez International Pictures*") is a Texas corporation with its principal place of business in Austin, Texas.

7.      On information and belief, Defendant MACHETE KILLS, LLC ("*Machete Kills*") is a Texas limited liability company with a principal place of business in Austin, Texas.

8.      On information and belief, Defendant MACHETE'S CHOP SHOP, INC. ("**Machete's Chop Shop**"), is a Texas corporation with its principal place of business in Austin, Texas.

9.      On information and belief, Defendant OVERNIGHT, LLC, doing business as Overnight Productions ("**Overnight LLC**"), is a Delaware limited liability company with its principal place of business in New York, New York.

10.      On information and belief, Defendant ALDAMISA ENTERTAINMENT, LLC ("**Aldamisa Entertainment**") is a California limited liability company with its principal place of business in Encino, California.

11.      On information and belief, Defendant 1821 PICTURES, INC. ("**1821 Pictures**") is a California corporation with its principal place of business in Los Angeles, California.

12.      On information and belief, Defendant QUICK DRAW PRODUCTIONS, LLC ("**Quick Draw Productions**"), is a Texas limited liability company with its principal place of business in Austin, Texas.

13.      On information and belief, Defendant OVERNIGHT FILMS, LLC ("**Overnight Films**"), is a Delaware limited liability company with a principal place of business in Los Angeles, California.

14.      On information and belief, Defendant OPEN ROAD FILMS, LLC ("**Open Road Films**"), is a Delaware limited liability company with a principal place of business in Los Angeles, California.

15.      The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants herein named as Does 1-100, inclusive, are unknown to Plaintiff.

Plaintiff therefore sues said Defendants by such fictitious names. When the true names and capacities of said Defendants have been ascertained, Plaintiff will amend this pleading accordingly.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction under 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff and all Defendants and the amount in controversy exceeds $75,000.

17.    As described below, although not citizens of the State of Utah, each of the Defendants conducts business in the jurisdiction of the United States District Court for the Central Division of Utah by purposefully offering for sale, distributing, and/or promoting films, actors, or other products in Salt Lake City, Utah, that impinge upon Plaintiff's intellectual property rights.

18.    As described below, this Court has personal jurisdiction over each of the Defendants based on Utah's "long-arm" statute, Utah Code Ann. § 78B-3-205, inasmuch as: (i) Defendants have purposefully conducted business with Utah businesses and persons, purposefully transacted business in the state of Utah, and/or have knowingly, and purposefully focused intentional and wrongful conduct (including defamatory statements and interference with economic relations as alleged herein) on the State of Utah, with full knowledge that the brunt of the injury would be felt in Utah; and (ii) the claims asserted herein arise out of those transactions and occurrences.

19.    Venue properly lies in this Court under 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claims herein occurred in the judicial district of Utah; Defendants

have caused harm to Plaintiff's reputation and business transactions within the judicial district of Utah.

20.     For example, as set forth in more detail below, defendant Rodriguez, on behalf of defendants Troublemaker Studios and Rodriguez International Pictures, induced and colluded with defendant Hinojosa, on behalf of defendant Talent Agency, to cause harm to Plaintiff by stopping or reducing its ability to profit from its Utah-produced films and games—such conduct was focused on the State of Utah as further described.

21.     As alleged herein, Defendants individually and collectively purposely availed themselves of the privileges and benefits of the laws of the state of Utah.  Defendants, individually and collectively, have also caused significant injury within the State of Utah, by, among other things, undertaking tortious acts that have caused injury to Plaintiff within the state of Utah.  Defendants' purposeful and tortious actions subject them to the jurisdiction of this Court.

22.     Additional examples are illustrative.  Defendant Gloria Hinojosa, and on behalf of Defendant Talent Agency, negotiated agreements relative to at least four films that were filmed in Utah, including *The Crow: Wicked Prayer, Zombie Hunter, The High Fructose Adventures of Annoying Orange*, and *Justin Time*.

23.     Likewise, Defendant Rodriguez sold the film *El Mariachi* in Utah during the Sundance Film Festival.

24.     This Court is the proper court for trial of this matter because many of the witnesses and interested parties are located in Utah, including Plaintiff and its partners and

associates, Chad Lee of React Films, Rick White of Fusion-io who facilitated the business relationship at the center of the dispute and React Games, who developed a product in dispute.

25.     This Court is the proper court for trial of this matter because a significant part of the damage caused to Plaintiff's income and property occurred in Utah.

## GENERAL ALLEGATIONS

26.     Plaintiff is a privately held company founded in Salt Lake, Utah acting as a full service independent film production and promotion company. Plaintiff creates films, mobile applications, and other media in the entertainment industry.

27.     Plaintiff, its predecessor, 8th Sister Films, and its owner Gil Medina, produced Utah-based independent films: *Propensity*, *Jack's Law*, *Rock N Lock*, and *The Insomniac*, and have seven additional Utah-based films in various stages of production, including *Ambition*, *My Dog Zeus*, *Jesus & Angeline: A Gangster Love Story*, *Have You Considered?*, and a three-film motion picture series entitled *Vengeance* (the "***Film***").

28.     Plaintiff specializes in action films, dramas, and thrillers and works with talent/actors that are marketable across a series of films. One such talent is Danny Trejo ("***Trejo***"), a Los Angeles-based actor.

29.     Plaintiff began and cultivated a long-standing business relationship with actor Danny Trejo, who appeared in leading roles for Plaintiff's films: *Jack's Law* and *Propensity* (released June 6, 2006, and January 20, 2006, respectively).

30.     Plaintiff identified Trejo as a dominant lead actor whose name, image, and likeness carried marketable value, and who could support a successful film series.

A.      ***Plaintiff Enters an Exclusive License with Actor Danny Trejo for his Name, Voice, Image, Likeness, Endorsement, and Signature***

31.     On April 25, 2006, Plaintiff and Trejo entered into a valid contract (the "***License Agreement***") whereby Plaintiff paid consideration to Trejo for *exclusive* worldwide rights to the name, image, likeness, signature, endorsement, and voice of the celebrity Danny Trejo (hereinafter referred to as Plaintiff's "***Property***") to use in connection with any products or services.

32.     The License Agreement provides that Plaintiff shall own, in perpetuity, all right, title and interest in and to, and the results and proceeds of Trejo's services provided in connection with all uses of the Property.

33.     The License Agreement grants Plaintiff the irrevocable right to use and permit the use of Trejo's name, image, likeness, endorsement, voice and biographical information for purposes of advertising, marketing, promotion and publicity.

34.     Although Plaintiff maintained the right to sublicense any portion of its rights under the License Agreement, the License Agreement has not been, and never was, assigned to any third party.

35.     Plaintiff remains the only party authorized to use the Property under the License Agreement.

36.     Both Plaintiff and Trejo were given the opportunity to be represented by independent legal counsel before signing the License Agreement, and both warranted that the License Agreement was executed voluntarily.

37.     In reliance on the License Agreement, and the rights granted to it under the License Agreement, Plaintiff has incurred substantial time, money, and effort in developing and

producing media content relative to Trejo.

38.     For example, in reliance on the License Agreement, Plaintiff has entered into a series of agreements and business relationships that depend entirely upon the exclusive nature of the rights granted to it from Trejo.

**B.      *Talent Agency and Hinojosa Had Actual Knowledge of the License Agreement and Acted in Knowing Violation of the Agreement and Have Caused Others to also Knowingly Violate the License Agreement***

39.     Hinojosa and Talent Agency have, for the relevant time periods set forth in this Complaint, acted as Danny Trejo's talent agent and agency.

40.     Hinojosa and Talent Agency cause agreements to be entered into between Trejo and third parties.

41.     David Markman ("***Markman***") drafted the License Agreement between Plaintiff and Trejo and provided notice and copies to Trejo's talent agent and agency, Hinojosa and Talent Agency.

42.     Markman is a shareholder of multinational law firm Greenberg Traurig, has been licensed to practice law since 1994, was selected by *Super Lawyers* magazine as a Rising Star in 2007, and focuses his practices on entertainment companies and "branded media." The firm, Greenberg Traurig, was recognized for its excellence in entertainment law in 2011 when it was named "Law Firm of The Year" in *U.S. News – Best Lawyers* for its Entertainment Law – Music practice.

43.     Hinojosa and Talent Agency were on notice of the existence of the License Agreement and its terms and that the License Agreement was valid and binding, and was, at the least, worthy of further inquiry before they chose to act in knowing violation of its terms.  This is

particularly true given Markman's credentials and reputation in the entertainment industry.

44.     Additionally, in 2006, Plaintiff provided Hinojosa and Talent Agency with a copy of the License Agreement, and since that time, Hinojosa and Talent Agency have been aware of the terms and conditions of the License Agreement, including that Plaintiff holds the exclusive license to the Property.

45.     In the years since 2006, Plaintiff has contacted Hinojosa and Talent Agency several times to discuss the License Agreement.

46.     Danon Jones, a co-producer of Plaintiff's Vengeance films, directly spoke with Hinojosa about the License Agreement, after it was clear Plaintiff's property rights were being violated; Hinojosa and Talent Agency were repeatedly put on notice that they were violating, and causing others to violate, the exclusive rights granted to Plaintiff.  Such notice was provided by Plaintiff, Mr. Jones, and numerous others.

47.     Hinojosa and Talent Agency, as evident in their titles, act as agents to their client Danny Trejo.  But when Trejo transferred all right, title, and interest in and to his name, voice, image, likeness, name, signature, and endorsement to Plaintiff through an exclusive license, Hinojosa and Talent Agency had a duty to conduct their business in a manner that did not violate the License Agreement; or, face potential liability for doing so.  Indeed, Hinojosa and Talent Agency were bound in their representation of Trejo to the extent Trejo had assigned away the Property.

48.     Neither Talent Agency nor Hinojosa have ever challenged the exclusive rights granted to Plaintiff under the License Agreement.

49.     Although Hinojosa and Talent Agency knew of, and never challenged, the License Agreement, and were repeatedly reminded of the exclusive rights held by Plaintiff, they systematically and continuously took actions to either directly violate or indirectly cause the violation of the License Agreement in order to profit thereby.

50.     Hinojosa and Talent Agency purposefully and recklessly entered into media agreements on Trejo's behalf that interfered with and violated the License Agreement by purporting to license and/or assign the Property to unauthorized third parties for commercial gain.

51.     Specifically, Hinojosa and Talent Agency interfered with Plaintiff's exclusive rights in the Property by, among other things, negotiating and entering into agreements to license and/or assign the Property in violation of Plaintiff's exclusive rights and failing to account to Plaintiff for royalties and other payments received in violation of Plaintiff's exclusive rights.

**C.**   **_Robert Rodriguez and His Affiliated Entities Had Actual Knowledge of the License Agreement and Acted in Knowing Violation of the Agreement and Have Caused Others to also Knowingly Violate the License Agreement_**

52.     Robert Rodriguez ("Rodriguez") established a relationship with Hinojosa and Talent Agency when Danny Trejo was cast in one of Rodriguez's films in 2007.

53.     Hinojosa informed Rodriguez of the existing relationship between Plaintiff and Trejo and of the License Agreement.  Nevertheless, Rodriguez, personally, and acting through his affiliated entities, continued to knowingly use Plaintiff's Property in films, ancillary products, and promotional materials—all in violation of Plaintiff's exclusive rights.

54.     On information and belief, in addition to receiving actual knowledge of the License Agreement from Hinojosa and Talent Agency, Rodriguez became aware of the

Agreement through other sources in the entertainment industry.

D.     _**Wrongful Use of Plaintiff's Property**_

55.     Shortly after the License Agreement was signed, Trejo's viability and popularity as a lead actor grew, due in large part because of Plaintiff's efforts and investments in films such as *Jack's Law* and *Propensity*.

56.     Thereafter, Trejo appeared in roles for Rodriguez films such as *Grindhouse* and *Planet Terror* (released in 2007), *Machete* (released in 2010), *Spy Kids: All the Time in the World in 4D* (wherein Trejo portrayed the character, Machete, a lead character from previous and future films), and *Bad Ass* (released in 2012).

57.     In each instance, Defendants' use of the Property was in knowing contravention of Plaintiff's exclusive rights, as set forth more particularly below.

**GRINDHOUSE**

58.     *Grindhouse* is a double feature movie featuring Robert Rodriguez's film *Planet Terror* and Quentin Tarantino's film *Death Proof* originally released together as one film, separated by a series of mock trailers.[1] The *Planet Terror* film and promotional material for both *Planet Terror* and *Grindhouse* up to and after the April 6, 2007 release date wrongfully used and misappropriated Trejo's name, likeness, image, voice and other aspects of Plaintiff's Property without consent or authorization. As a result, Defendants benefited from $25 million gross box office earnings by exploiting Trejo's portrayal of Machete, a character in the film.

---

[1] Trejo is credited in *Planet Terror*, and in *Grindhouse*, but not in *Death Proof*. Trejo appears in the mock trailers.

59.     *Planet Terror* was produced by the following defendant companies: Dimension Films, Troublemaker Studios, Rodriguez International Pictures, The Weinstein Company, and Does 1-20.

60.     Hinojosa and Talent Agency represented Trejo with respect to his involvement in *Planet Terror* and *Grindhouse*. Through the involvement of Robert Rodriguez as the director, and Hinojosa and Talent Agency, the producers knew of the License Agreement and Plaintiff's exclusive rights in the Property.

61.     No person or company affiliated with either *Grindhouse* or *Planet Terror* entered into an agreement with Trejo before April 25, 2006 that would authorize their use of Plaintiff's Property in the film.

62.     No person or company affiliated with either *Grindhouse* or *Planet Terror* approached Plaintiff to use or license Plaintiff's Property nor did Plaintiff grant use of such Property to anyone associated with the films.

63.     Plaintiff is entitled to royalty fees for any such use as set forth in the License Agreement.

64.     Plaintiff is also entitled to an award of damages for a loss in profits on its films and media projects because of these knowing, purposeful, and intentional violations of the License Agreement.

## SPY KIDS

65.     Defendants Troublemaker Studios, and Does 21-40 produced *Spy Kids: All the Time in the World in 4D*, which was released in the United States on August 19, 2011. The movie featured Plaintiff's Property as Trejo portrayed the character, Uncle Machete, in violation

of Plaintiff's exclusive rights.   Related marketing materials and ancillary products likewise misappropriated the Property in violation of Plaintiff's rights.

66.   The film grossed $78 million worldwide, because, *inter alia*, it featured Trejo's name, likeness, image, voice, and other portions of Plaintiff's Property.

67.   Hinojosa and Talent Agency represented Trejo with respect to his involvement in *Spy Kids: All the Time in the World in 4D*. Through the involvement of Robert Rodriguez (owner and/or principal of Troublemaker), Hinojosa and Talent Agency, and the producers knew of the License Agreement and Plaintiff's exclusive rights in the Property.

68.   Plaintiff did not authorize or license the use of its Property to anyone affiliated with the film *Spy Kids: All the Time in the World in 4D.*

69.   No person or company affiliated with *Spy Kids: All the Time in the World in 4D* entered into an agreement with Trejo before April 25, 2006 that authorized use of Plaintiff's Property in the film, marketing materials, and ancillary products.

70.   Plaintiff is entitled to royalty fees for any such use as set forth in the License Agreement.

71.   Plaintiff is also entitled to an award of damages for a loss in profits on its films and media projects because of these knowing, purposeful, and intentional violations of the License Agreement.

**MACHETE**

72.   In the summer of 2009, Trejo began filming the movie *Machete*, produced by Overnight, LLC and Does 41-60, and owned by Machete's Chop Shop, Inc. In knowing violation

of Plaintiff's Property rights, the owners and producers of the film *Machete* including Defendant Rodriguez marketed, licensed, and sold the film and improperly profited thereby.

73.     Trejo appeared in film advertisements, posters, trailers, and other promotional materials for the movie in violation of Plaintiff's exclusive rights.

74.     Hinojosa and Talent Agency represented Trejo with respect to his involvement in *Machete*. Through the involvement of Robert Rodriguez (owner and/or principal of Overnight), Hinojosa and Talent Agency and the producers knew of the License Agreement and the exclusive rights of Plaintiff in the Property.

75.     The producers, owners, and stakeholders of *Machete* never requested nor received consent or authorization from Plaintiff to use the Property.

76.     *Machete* grossed an estimated $39 million in the three months following its September 2010 theatrical release, and with an estimated $10.5 million budget, allowed film owners and stakeholders to profit more than $25 million off the unlawful use of Plaintiff's Property.

77.     Plaintiff is entitled to royalty fees for any such use as set forth in the License Agreement.

78.     Plaintiff is also entitled to an award of damages for a loss in profits on its films and media projects because of these knowing, purposeful, and intentional violations of the License Agreement.

**E.    _An Injunction is Necessary To Prevent Irreparable Damage to Plaintiff's Exclusive Property Rights._**

**MACHETE KILLS**

79.    Defendants Aldamisa Entertainment, 1821 Pictures, Quick Draw Productions, Machete Kills, LLC, Overnight Films, and Does 61-80 produced _Machete Kills_, and Open Road Films and Does 81-100 are distributing the film. These entities are collectively referred to herein as the ("**_Machete Kills Defendants_**").

80.    _Machete Kills_ is the sequel to the _Machete_, and is expected to be released September 13, 2013 in the United States.

81.    The Machete Kills Defendants have commenced marketing the film, and are wrongfully appropriating Plaintiff's Property in order to gain exposure, increase hype, and otherwise promote the film.

82.    Hinojosa and Talent Agency represented Trejo with respect to his involvement in _Machete Kills_. Through the involvement of Robert Rodriguez (owner and/or principal of Overnight), Hinojosa and Talent Agency, the Machete Kills Defendants knew of the License Agreement.

83.    Additionally, Machete Kills, LLC and _Machete Kills_ director and producer, Robert Rodriguez, were given actual knowledge of the existence of the License Agreement at least by 2007 and through multiple sources thereafter, as set forth above.

84.    Machete Kills, LLC and Rodriguez were again on actual notice of the License Agreement and Plaintiff's exclusive rights in the Property, when the original Complaint was filed in this action on January 29, 2013.

85.     The Machete Kills Defendants have never asked for, nor received, authorization from Plaintiff for use of the Property.

86.     The Machete Kills Defendants intend to, and will, benefit and profit off of their unauthorized use of the Property in violation of Plaintiff's exclusive rights.

87.     Concurrent with the Machete Kills Defendants' production, release, and distribution of the Machete Kills and related ancillary products, Plaintiff is releasing the first in a trilogy of competing films entitled *Vengeance ("Film")*, starring Danny Trejo.

88.     The Machete Kills' Defendants' improper violations of Plaintiff's exclusive rights have, and are, irreparably damaging Plaintiff's ability to release and distribute the Vengeance Film, by unlawfully appropriating Trejo's image, voice, and likeness in a competing film, seizing marketplace opportunities, diluting Vengeance's presence and recognition in the market, and otherwise usurping Plaintiff's commercial opportunities with respect to a similar-genred film starring Trejo.

**F.      *Defendants Intentionally and Unlawfully Interfered with Plaintiff's Business in Utah.***

### RICK WHITE—FUSION-IO

89.     Plaintiff has had a long-standing business relationship with Utah-based technology company, Fusion-IO.

90.     In particular, Plaintiff and Fusion-IO's Chief Marketing Officer, Rick White (*"White"*), worked for years on many marketing endeavors for Fusion-IO.

91.     In 2006, Rick White learned that Plaintiff had acquired an exclusive license in Danny Trejo's name, likeness, image, voice, endorsement, and signature as set forth in the License Agreement.

92.     Realizing that Plaintiff's Property has significant value and business potential, Rick White caused Fusion-IO to enter into an agreement with Plaintiff for the use Plaintiff's Property in promotional campaigns for the company.

93.     Trejo consequently appeared in promotional campaigns for Fusion-IO and provided his name, likeness, image, and voice to the company's films and projects in accordance with Plaintiff's agreement with Fusion-IO and Trejo's License Agreement with Plaintiff.

94.     As a part his business relationship with Plaintiff, Rick White introduced Plaintiff to his business associate, Steve Wozniak, in anticipation of a future business relationships involving those parties.

## STEVE WOZNIAK

95.     Steve Wozniak ("*Wozniak*") is best known for his role in inventing the original Apple computer and for co-founding Apple Computer, Inc. with the late Steve Jobs. Although he no longer works at Apple, Wozniak continues to be a celebrity in the technology world and has garnered a significant online following for his contributions to the technology. Wozniak's following includes hundreds of thousands of followers on twitter.com and facebook.com. Wozniak's online presence and followers are only a small part of his extensive world-wide persona and celebrity status.

96.     Wozniak works as Chief Scientist for Fusion-IO and has held that position since 2008. As Chief Scientist, Wozniak is one of eight members of Fusion-IO's elite management team.

97.     Wozniak's employment at Fusion-IO and relationship with Utah resident, Rick White, led to his introduction to Plaintiff.

98.     Through Wozniak's Utah connections, including Rick White, Wozniak learned of Plaintiff's License Agreement with Trejo.

99.     Wozniak also learned that Plaintiff was producing the Vengeance Film starring Trejo and that Plaintiff was commencing marketing, and exploring innovative strategies to promote the movies and create ancillary products, such as video games featuring Trejo.

100.    One marketing approach included creating a mobile game application ("***App Game***") that introduces viewers to Trejo's character in the Vengeance Film and allows them to play missions that are congruent with the Film's plot line.

101.    Plaintiff sought a partnership with Wozniak to create the App Game and promote and market the Vengeance Film.

102.    The App Game, entitled Danny Trejo's Vengeance: Woz with a Coz, features billionaire, Wozniak, and Trejo.

103.    Wozniak was instantly attracted to the idea of working on a project associated with Plaintiff and Trejo and partnering in a new venture.

104.    Wozniak had never developed a game application nor had he promoted, supported, or loaned his name to such a product; consequently, to the computer and online world that craved Wozniak's celebrity, this is/was a groundbreaking event.

105.    Wozniak's endorsement of the App Game would lend credibility to the App Game and the Vengeance Film and create a unique marketing and promotion opportunity based on Wozniak's connections and expansive following.

106.    As of the date of this Complaint, the App Game is the first and only game application on which Wozniak has collaborated and with which Wozniak is associated.

107.   Plaintiff entered into an agreement with Wozniak wherein Wozniak would give his name, likeness, image, celebrity endorsement, online promotion, as well as promotion in other venues in exchange for a percentage of net profits from the App Game.

108.   Significantly, Wozniak not only viewed this partnership as an investment but also a family affair, enlisting his wife, Janet Wozniak (who is also well-known) to appear as a character in the App Game.

109.   In accordance with Wozniak's agreement with Plaintiff, Wozniak recorded his portions of the App Game for use by React Games to physically create the App Game in Utah (as described below).

**REACT GAMES**

110.   In mid-2011, Plaintiff approached React Games, LLC ("***React***"), a Utah-based game company, about creating an electronic game application that would promote Plaintiff's Trejo Film and would create additional revenue: the App Game.

111.   React was interested in working with Plaintiff when it learned that Plaintiff had an agreement with Trejo and Wozniak to appear as characters, and that Wozniak would promote the project.

112.   Chad Lee, owner and president of React, estimated that this particular App Game would generate approximately $5 million per month because of the appearance of Trejo and Wozniak and the accompanying promotional support from Wozniak.

113.   Plaintiff and React understood and relied upon Wozniak's following and connections in entering into an agreement to create the App Game.

114.   React's involvement was contingent upon Wozniak's tie with the game and his

promised promotional support.

115.   In addition, React was attracted to the idea of producing the App Game because of Fusion-IO's involvement.

116.   Plaintiff's two separate but related relationships with Fusion-IO and Steve Wozniak caused React to enter into an agreement with Plaintiff to build the App Game.

117.   React developed the game to capitalize on the relationships Plaintiff had already cultivated with third parties: Steve Wozniak as an integral character, "Ricardo Blanco" (referring to Rick White) as a character in the App Game, and prominently featuring Fusion City, a nod to the Utah-based technology company for which Wozniak and White both worked.

118.   In reliance on Plaintiff's business relationships with Rick White and Wozniak, React agreed to provide hundreds of thousands of dollars in money and other valuable services to fund development costs of the App Game.

119.   The parties' agreement became effective in October 2012 with an initial term of 24 months ("*Term*"), which enabled the parties to renegotiate a separate agreement two years later when updates could track market receptivity toward the App Game and the Vengeance Film.

120.   It was therefore imperative that the App Game and Film be released during the term with Trejo and Wozniak as planned in order to generate the expected revenues as well as take advantage of the upcoming film release.

121.   During the limited Term, Plaintiff and React contemplated incorporating other complex characters in the games, including other celebrities and characters from Plaintiff's Film.

122.   Pursuant to the agreement, React built in a platform for potential sponsorship and

product placement portals within the App Game itself, allowing third party businesses to purchase advertising space within the game. This business model was entirely predicated on the App Game's success through Wozniak's involvement and active promotion as agreed to by Plaintiff and Wozniak.

123.   Plaintiff would receive 100% of all advertising and cross-promotional inventory in the App Game.

124.   For example, in the fall of 2012, Plaintiff consequently contacted Remington Arms Company, LLC, a producer and seller of firearms, for a potential sponsorship placement in the App Game.

125.   The written agreement between Plaintiff and React did not come without risk to Plaintiff. If a set minimum download requirement was not met within 120 days of the launch, Plaintiff would owe React Games tens of thousands of dollars in penalties.

126.   Plaintiff and React worked feverishly, expending significant time, money and resources through production in order to release the game in time for the scheduled debut on November 22, 2012.

G.   **_Defendants Knowingly and Unlawfully Interfered with Plaintiff's Business Relationships, Diluting Plaintiff's Property Rights, Undermining his Role in the Utah Independent Film Industry, and Severing his Relationships with Wozniak and React Games._**

127.   Due to Wozniak's support, the App Game immediately garnered media attention and publicity for itself and the Vengeance Film.

128.   The App Game was critically-acclaimed and was featured prominently in numerous popular tech blogs, including Tech Crunch, The Verge, CNET, and a blog on Apple's own App Store website. Wozniak even posted the App Game poster and a link to App Game

information on his Facebook site, which attracted many of his followers (more than 214,000) to the game.

129.    Plaintiff is informed and believes that Robert Rodriguez learned of the App Game and Vengeance Film during the process of producing *Machete Kills.*

130.    Plaintiff is informed and believes that Rodriguez knew that the success of Plaintiff's App Game and Vengeance Film would diminish the sales of his competing product, *Machete Kills*, which he knew would be promoted at the same time. Rodriguez, with the cooperation of the Machete Kills Defendants and Hinojosa and the Talent Agency colluded to increase the success of *Machete Kills* by improperly interfering with the Utah-based App Game and Film.

131.    Because Plaintiff had a valid agreement with Trejo to use the Property, Rodriguez had no legitimate means to stop the Film or the App Game. Thus, Rodriguez contacted Hinojosa and Talent Agency.

132.    Rodriguez convinced Hinojosa that competition from the App Game and Film would reduce the profitability of *Machete Kills*. Rodriguez then worked with Hinojosa and Talent Agency to shut down Plaintiff's Trejo-related operations. Because Hinojosa and Talent Agency represent Trejo on a commission basis, they feared that they would lose substantial revenue if Rodriguez stopped working with Trejo and therefore they were more than willing to go along with Rodriguez's requests.

133.    Rodriguez, Hinojosa and Talent Agency knew that by interfering with promotion of the App Game, they would significantly impact promotion of the competing Vengeance Film, clearing the way for *Machete Kills*.

134.    Hinojosa, working on the advice and direction of Rodriguez, contacted Steve and Janet Wozniak (the "***Wozniaks***") and intimidated and threatened the Wozniaks to cease their support of the App Game and Film, by, *inter alia* (1) demanding to know the nature of the relationship with Plaintiff and the details of the confidential agreement between the parties with respect to compensation and other material terms; (2) improperly and illegally asserting that continued support would result in a suit being brought by Rodriguez and the Talent Agency, though no legitimate cause of action existed; (3) making false and defamatory statements about Plaintiff and its Owner, including that he was a fraud, criminal, did not have a license agreement with Trejo, could not legally create the App Game or release the Vengeance Film, and other false and materially misleading statements.

135.    At the time that Hinojosa threatened the Wozniaks, she knew that neither she nor Rodriguez had any legitimate cause of action against the Wozniaks, and that the threatened lawsuit would be a meritless lawsuit filed for no purpose other than to harass and cause expense to the Wozniaks and disparage their valuable celebrity status and world-wide recognition.

136.    In an attempt to interfere with and prevent the performance of Plaintiff's business agreement with Wozniak, React, Fusion, and others in the film industry, Hinojosa, on behalf of Talent Agency and on the advice and direction of Rodriguez and his affiliates, knowingly misrepresented to the Wozniaks that Plaintiff did not have a contract with Trejo and had not worked with Trejo for ten years.

137.    Hinojosa also falsely told the Wozniaks that the Owner was a "fraud" and a "con man" in an attempt to defame the Plaintiff and the Owner, and destroy Plaintiff's and Owner's business relationships with React, Wozniak, and others.

23

138.   Plaintiff and Owner had just finished working with Trejo on a project for Fusion-IO in the summer of 2012, and Defendants knew that Plaintiff and Trejo had an active working relationship under the enforceable License Agreement.

139.   Hinojosa, on behalf of Talent Agency, and at the behest of Rodriguez, bullied, threatened, and intimidated the Wozniaks to damage sales of the Film and App Game and sever Plaintiff's business relationships.

140.   Based on the false representations, unlawful intimidation, and threats of a baseless lawsuit, the Wozniaks backed out of their involvement with the App Game and related promotions.

141.   Wozniak thereafter refused to talk to reporters, and he turned down interviews related to the App Game.

142.   Wozniak pulled his support online and removed all references of the Game App from his Facebook and Twitter accounts.

143.   Wozniak backed out of promoting the App Game before its scheduled release date of November 22, 2012.

144.   Because Wozniak refused to promote the App Game, Plaintiff was damaged in an amount to be proven at trial but no less than $5 million per month in sales of the App Game.

145.   Significantly, Plaintiff created the App Game for the primary purpose of promoting the Film.

146.   Because Wozniak backed out of promoting the App Game, the App Game has not been able to support promotion of the Film, which has damaged Plaintiff in an amount to be proven at trial, but no less than $11 million.

147.    Significantly, Wozniak informed his business associate at Fusion-IO, Rick White, that Hinojosa's and Rodriguez's threats were the reason he backed out of his support of the App Game and the basis by which he severed his business relationship with Plaintiff.

148.    Before Hinojosa's threatening phone call, Wozniak had posted the App Game poster and game information on his Facebook site, which attracted many of his 214,000+ followers to the App Game.

149.    Per his comments to Rick White, Plaintiff's business partner, Wozniak took down his personal promotion of the App Game as a direct result of Hinojosa's and Rodriguez's bullying and intimidation, which damaged potential profits for both the App Game and the Film.

150.    Defendants' intimidation continued. Hinojosa, on advice of Rodriguez, threatened Danon Jones, a co-producer of the Film, and made statements that Defendants would destroy Plaintiff's and Jones' livelihood and reputation if Plaintiff and Jones failed to take "the machete out of Trejo's hand" in the App Game.

151.    Plaintiff holds a valid license to the name "Machete" from Rick Schwartz to be used for any ancillary purpose and for cross-promotion for the Film, including the App Game. This valid license is the reason for Defendants' threats.

152.    Plaintiff has been damaged by Hinojosa's and Rodriguez's actions, including, but not limited to the (1) severance of its business relationship with Steve and Janet Wozniak, (2) diminished reputation in the film industry, (3) lost profits from the App Game, (4) injury to its business relationship with React, and (5) diminished value and lost profits for the Film.

## FIRST CAUSE OF ACTION

### *Abuse of Personal Identity under Utah Code Ann. § 45-3-3 (All Defendants)*

153.    Plaintiff realleges and incorporates by this reference the allegations set forth above as if fully set forth herein.

154.    The following elements of Danny Trejo's personal identity were validly and exclusive conveyed through the License Agreement to Plaintiff: name, image, likeness, signature, endorsement, and voice.

155.    Defendants published advertisements and various other promotional materials in connection with their films that included Plaintiff's Property. These advertisements and promotional materials appeared throughout Utah and in other jurisdictions.

156.    Defendants published these promotional materials and advertisements in a manner that suggested or implied that Plaintiff, itself, and as the owner of the Property, approves, endorses, has endorsed, or will endorse Defendants' particular product(s).

157.    Defendants neither sought nor obtained consent from Plaintiff for such actions.

158.    Defendants knowingly authorized the advertisement and promotion of all Defendants' projects and products (as set forth above) in direct violation of Plaintiff's rights and without obtaining Plaintiff's consent.

159.    Defendants' infringement was an intentional act. Defendants knew they were violating the rights of Plaintiff, a Utah company. Moreover, Defendants knew that they were violating Plaintiff's rights by publishing advertisements and other promotional materials in Utah.

160.    Notably, Plaintiff produces movies and otherwise uses its Property in the State of Utah.

26

161.    In addition to purposefully interfering with Plaintiff's rights under the License Agreement through their tortious actions in Utah, Defendants knew that the effects of their wrongful acts would be felt by Plaintiff primarily in the State of Utah.

162.    Plaintiff was damaged to a degree and in an amount to be determined at trial, together with the value of interest, costs, and attorneys' fees as set forth in the Prayer for Relief. Plaintiff's damages arises from, *inter alia*, publication of promotional materials and advertisements in the State of Utah that violate its rights in the Property.

## SECOND CAUSE OF ACTION

### *Common Law Misappropriation of Identity (All Defendants)*

163.    Plaintiff realleges and incorporates by this reference the allegations set forth above as if fully set forth herein.

164.    Defendants used Plaintiff's Property rights in Trejo's name, likeness, image, voice, signature, and endorsement in various film projects and marketing materials without Plaintiff's implied or express consent or authorization.

165.    Defendants' use of Plaintiff's Property included the publication of advertisements and the dissemination of promotional materials in the State of Utah, with the intent of inviting consumers to view Defendants' films in the State of Utah.

166.    Defendants knew of the Licensing Agreement at the time they used the Property, and continue to use the Property to this day.

167.    Plaintiff's rights in the Property have proven economic and commercial value, and Defendants used the Property in order to increase value to their own projects and for personal commercial gain.

168.     Defendants experienced an increase in sales, revenue, viewership, and exposure as a result of their unauthorized use of Plaintiff's Property, including their unauthorized use of Plaintiff's Property in Utah.

169.     Defendants' unauthorized use of Plaintiff's Property caused damage to Plaintiff's ability to license its Property to third parties, collect licensing fees from Defendants and other parties who violated Plaintiff's rights, and to market and distribute its own films and entertainment products, including without limitation the App Game and Vengeance Film.

170.     Additionally, Defendants' unauthorized use of Plaintiff's Property caused damage to Plaintiff's ability to license its Property to third parties and other film-industry related individuals and companies within Utah—the state in which Plaintiff is based and produces most of its products.

171.     The damage caused to Plaintiff shall be established in an amount to be determined at trial, together with the value of interest, costs, and attorneys' fees as set forth in the Prayer for Relief.

### **THIRD CAUSE OF ACTION**

### ***Unfair Competition (All Defendants)***

172.     Plaintiff hereby incorporates by reference each of the other allegations set forth elsewhere in this Complaint as though fully set forth in this cause of action.

173.     In 2006, Hinojosa and Talent Agency first became aware of Plaintiff's License Agreement with Trejo and were continually reminded of the License Agreement through various letters sent to them by counsel.

174.     Hinojosa and Talent Agency represented to Wozniak, Rodriguez, and others in the

film industry that Plaintiff had no rights to Trejo's Property, despite the existence of Plaintiff's valid License Agreement.

175.     Through their designation as agents of Danny Trejo, Hinojosa and Talent Agency attempted to pass off the Trejo Property as unencumbered property that is available for use and exploitation by other parties despite Plaintiff's contract with Trejo.

176.     Hinojosa and Talent Agency successfully passed off the Trejo Property as its own to license at will by inducing filmmakers, game makers, promoters, and others in the entertainment industry to use the Trejo Property over the past seven years in violation of Plaintiff's exclusive rights.

177.     Rodriguez and Doe Defendants have passed off the Trejo Property as their own in their previous films and promotional materials. Upon information and belief, they have done so in Utah, among other places.

178.     Rodriguez and Doe Defendants continue to pass off the Trejo Property as their own on the film projects set forth above and accompanying promotional materials for the same, despite having actual knowledge of the License Agreement. Upon information and belief, they continue to do so in Utah, among other places.

179.     Rodriguez and Doe Defendants have successfully passed off the Trejo Property as their own by inducing audiences, financial backers, and other parties with a stake in the film projects set forth above to believe that Defendants own the rights to the Property. Upon information and belief, they continue to do so in Utah, among other places.

180.     Defendants' actions described herein constitute unlawful, unfair, and/or fraudulent business acts or practices; Defendants' actions therefore constitute unfair competition.

181.    As a proximate result of Defendants' actions, Plaintiff has suffered an injury in fact, including without limitation, damages in an amount to be proven at trial, loss of money and diminution in the value of its Property rights.

182.    Defendants' actions have caused, and will continue to cause Plaintiff to suffer irreparable harm unless enjoined by this Court. In addition, Plaintiff requests that the Court order that Defendants disgorge all profits wrongfully obtained as a result of Defendants' unfair competition, and order Defendants pay restitution to Plaintiff in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### *Unfair Competition (Lanham Act)(Defendants Hinojosa and Talent Agency)*

183.    Defendants Hinojosa and Talent Agency made false and misleading representations of fact in connection with promoting Danny Trejo and the Trejo Property in violation of Plaintiff's exclusive rights in the Property. Specifically, Hinojosa and Talent Agency represented to third parties that the Property was unencumbered and freely licensable through Defendants, despite the fact that Defendants had actual knowledge that Plaintiff owned the exclusive license in the Property.

184.    Defendants Hinojosa's and Talent Agency's false and misleading representations were carried through the stream of commerce through the website IMDB.com, and other online and offline sources, through word of mouth at film festivals (including Utah's Sundance Film Festival), through emails to business contacts throughout Utah and the nation, including financiers, film producers, distributors, and casting agents.

185.    The false and misleading statements made by Hinojosa and Talent Agency caused confusion in the marketplace as to the source and rights in the Property and made third parties

mistakenly believe that to license Trejo's image, they must work with Defendants, not Plaintiff.

186.    The false and misleading statements made by Hinojosa and Talent Agency caused confusion in the marketplace as to the encumbered nature of the Trejo Property. While Hinojosa and Talent Agency represented that the rights were available, the rights, in fact, exclusively belonged to Plaintiff and could only be licensed through Plaintiff.

187.    The damage caused to Plaintiff shall be established in an amount to be determined at trial, together with the value of interest, costs, and attorneys' fees as set forth in the Prayer for Relief.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment (*All Defendants*)

188.    Plaintiff incorporates by reference each of the other allegations set forth elsewhere in this Complaint as though fully set forth in this cause of action.

189.    After Trejo signed the License Agreement transferring all right, title, and interest in his name, likeness, image, voice, endorsement, and signature to Plaintiff, Defendants continued to use or authorized the use of Plaintiff's Property without consent.

190.    Defendants received payments, revenues, and sales based on their unauthorized use of Plaintiff's Property, either directly or through commission, and were unjustly enriched as a result.

191.    Plaintiff is entitled to recover profits associated with sales and commissions Defendants collected as a result of Defendants' use of Plaintiff's Property for the period between April 25, 2006 and the present date.

192.    Plaintiff has been damaged as a result of Defendants' unjust enrichment and is

also entitled to any and all damages in connection with Defendants' unjust enrichment as shall be determined at trial, along with costs and attorneys' fees.

## SIXTH CAUSE OF ACTION

### *Intentional Interference with Economic Relations*

### *(Defendants Rodriguez, Hinojosa and Talent Agency)*

193.    Plaintiff realleges and incorporates by reference the allegations contained in the above paragraphs of the Complaint as though set forth fully herein.

194.    Plaintiff entered into a business relationship with Danny Trejo consummated by the License Agreement, which granted Plaintiff certain Property rights in and to Trejo's name, likeness, image, voice, signature, and endorsement.

195.    Thereafter, Plaintiff entered into a business relationship with Steve Wozniak wherein Wozniak would provide his name, likeness, image, and voice to Plaintiff's App Game to support Plaintiff's film in exchange for a share of profits in the venture. The agreement also stipulated that Wozniak would use his considerable weight in the technology industry to lend credibility and popularity to the App Game.

196.    Plaintiff entered into a business relationship with React Games wherein React Games agreed to produce the App Game contingent upon Rick White's and Steve Wozniak's involvement and promotion of the game.

197.    Plaintiff had a reasonable expectation of commercial gain from each of these relationships.

198.    Defendants were aware of Plaintiff's business relationships with Danny Trejo, Steve Wozniak, Fusion-IO, and React Games. Defendants intentionally ignored the rights granted

and obligations inherent in Plaintiff's agreements with Trejo, Wozniak, Fusion-IO, and React Games.

199.    Defendants understood that circumventing normal channels of competition and instead unlawfully threatening and intimidating Wozniak (as set forth above) would cause Wozniak to pull his support and cause Plaintiff's ventures to lose substantial amounts of money, effectively stalling the projects – and in fact their actions did cause Wozniak to pull his support causing millions of dollars in lost profits and damage to Plaintiff's business relationships. This is precisely why Defendants interfered with Plaintiff's contractual relationship with the Wozniaks.

200.    Defendants engaged in conduct that had an adverse effect on Plaintiff's ability to profit off its rights, including (i) tortiously interfering with the agreements and business relationships set forth herein; (ii) willfully ignoring the rights under the License Agreement and other agreements of the parties in order to profit thereby and purport to do deals with the Property in violation of Plaintiff's exclusive rights, (iii) intentionally omitting mention of the License Agreement with third parties, and (iv) exploiting Trejo's name, likeness, image, voice, signature, and endorsement to Plaintiff's detriment and Defendants' benefit.

201.    In their agency relationship with Trejo, Defendants Hinojosa and Talent Agency stood in the ideal position to inform third parties of Trejo's obligations to Plaintiff and Plaintiff's exclusive rights, but instead intentionally interfered with the potential licensing opportunities with third parties (as set forth herein) in order to retain the profit and advantage for themselves. Defendants Hinojosa and Talent Agency knew of the License Agreement but purposefully withheld that information for their own profit.  In addition, Hinojosa and Talent Agency willfully disregarded their obligation to Plaintiff to account for third party agreements that licensed

Plaintiff's Property rights.

202.    Defendants' intentional interference caused harm or destruction to Plaintiff and was done for the improper purpose of maintaining commercial benefit to Defendants without paying royalties to Plaintiff.

203.    Defendants' improper conduct was the proximate cause of harm to Plaintiff regarding the destruction of agreements and business dealings between Plaintiff and Trejo, React Games, Wozniak, and Fusion-IO; additionally, preventing Plaintiff from capitalizing on the full benefit of its bargain in the License Agreement, preventing Plaintiff from licensing its Property rights to other parties, and diluting the value of the App Game, the Film, and Plaintiff's other media projects.

204.    Defendants' wrongful acts were intentional, active, egregious, and willful.

205.    Defendants knew that the focal point of their interference was in the State of Utah, where the Plaintiff, its principal, React and Fusion are located and conduct their business. Defendants also knew that the brunt of their injury would be felt in Utah by these same parties.

206.    As a direct and proximate result of Defendants' intentional interference with the Plaintiff's economic relations, Plaintiff has been damaged, the exact amount to be more fully proven at trial.

207.    Plaintiff is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

## SEVENTH CAUSE OF ACTION

### *Negligence (Defendants Hinojosa and Talent Agency)*

208.    Plaintiff incorporates by this reference the allegations set forth above as if fully set forth herein.

209.    Defendants Hinojosa and Talent Agency possess a duty to those with whom their client Danny Trejo contracts for engagements related to film and entertainment. This includes a duty to keep on file all current client agreements and prevent any conflicts in concurrent agreements.

210.    Hinojosa and Talent Agency possess a duty to those who hold the exclusive rights to their client's name, likeness, image, voice, signature, and endorsement because such license holders stand in the place of their client with respect to those particular intellectual property rights.

211.    Hinojosa and Talent Agency ignored and disregarded these duties by deliberately and carelessly authorizing Trejo's participation in films and promotional projects without informing Plaintiff or gaining Plaintiff's permission.

212.    Defendants' conduct falls below that of reasonable persons in the industry and is in breach of the duties they owed to their client with respect to the Property and therefore to Plaintiff regarding the same property rights in their client's name, likeness, image, voice, signature, and endorsement.

213.    Hinojosa and Talent Agency breached their duty by (i) failing to apprise third parties of the existence of Plaintiff's contract with their client, (ii) failing to inform Plaintiff of potential violations of Plaintiff's Property granted in the License Agreement, and (iii) failing to

meet industry standards associated with the rights relative to industry-related agreements consummated by their client.

214.   Plaintiff has been damaged in an amount to be more fully proven at trial and is entitled to judgment against the Defendants as set forth below in the Prayer for Relief.

## EIGHTH CAUSE OF ACTION

### *Defamation and Slander Per Se*

### *(Defendants Rodriguez, Hinojosa and Talent Agency)*

215.   Plaintiff realleges and incorporates by this reference the allegations set forth above as if fully set forth herein.

216.   Defendant Hinojosa, on behalf of Talent Agency contacted the Wozniaks (as set forth above) and made false, defamatory statements about Plaintiff, claiming that Plaintiff: (1) was a fraud; (2) was perpetuating an illegal activities; (3) that it had no valid business relationship with Trejo; and (4) that Wozniak's business involvement with Plaintiff would lead to costly litigation brought by herself, Robert Rodriguez, and companies involved with *Machete Kills* because Plaintiff's conduct was incompatible with the exercise of a lawful business.

217.   Defendants Rodriguez and his related entities worked in concert with Hinojosa and Talent Agency to construct the nature of the defamatory statements and whom to target that would cause the greatest harm and injury to Plaintiff, its business, and its existing business relationships.  Upon information and belief, Rodriguez was aware of these specific defamatory statements and played a direct role in concocting and causing them to be made.

218.    The statements regarding Plaintiff were false, defamatory, and not subject to any privilege.

219.    The statements impeached Plaintiff's honesty, integrity, and reputation, exposing Plaintiff to public contempt and ridicule in the film industry and with its own business partners, Wozniak, Fusion-IO, React Games, and Trejo; these statements damaged Plaintiff's reputation and livelihood.

220.    Defendants' statements directed at Plaintiff's existing business partner that Plaintiff's principal is a con artist, that Plaintiff is perpetuating an elaborate and illegal scheme regarding Trejo with no basis in actual contractual relations is highly offensive to a reasonable person.

221.    Defendants knew that the focal point of the defamatory statements, made by Hinojosa on behalf of Talent Agency and at the behest of Rodriguez, was in the State of Utah, where the Plaintiff and its principal are located and conduct their business.  Defendants also knew that the brunt of the injury from their defamatory statements would be felt in Utah, particularly given their efforts to destroy the contractual relationships between Plaintiff, the Wozniaks, Fusion-IO, and React (all of whom, other than the Wozniaks, are located in Utah).

222.    Defendants knew and acted in reckless disregard of the falsity of the statements they made and the false light in which Plaintiff would be placed; and Defendants statements were made with actual malice as more fully described above.

223.    The statements rise to the level of defamation per se because Defendants claimed Plaintiff and its principal engaged in criminal conduct and conduct that is incompatible with the exercise of a lawful business, trade, profession, or office.

224.    The damage inflicted on Plaintiff shall be established in an amount to be determined at trial, together with the value of interest, costs, and attorneys' fees as set forth in the Prayer for Relief.

## NINTH CAUSE OF ACTION

### *Civil Conspiracy*

### *(Defendants Rodriguez, Hinojosa and Talent Agency)*

225.    Plaintiff incorporates by this reference the allegations set forth above as if fully set forth herein.

226.    As described below, Defendants engaged in a civil conspiracy.

227.    Rodriguez, individually and as an agent of *Machete Kills* and its related films, worked together with Hinojosa, individually and as an agent for Talent Agency, and formed a common scheme to defraud Plaintiff from the opportunity to commercialize the Film and the App Game by circumventing legal channels and intentionally interfering with Plaintiff's economic relations with Trejo, Wozniak, and React Games as set forth above.

228.    Defendants' scheme was to, among other things, prevent Plaintiff from commercializing the Film and the App Game in favor of Defendants exploiting the film *Machete Kills* and increasing their own profits.

229.    Defendants aspired to accomplish the object of defaming and tortiously interfering with Plaintiff business relationships, and misappropriating its intellectual property rights as set forth above in the general allegations and other causes of action.

230.    Defendants had a meeting of the minds relating to their common scheme to unlawfully injure Plaintiff.

231.    As set forth herein, Defendants committed one or more unlawful overt acts in their scheme to defame and unlawfully injure Plaintiff, including all of the torts alleged and pleaded in this Complaint above.

232.    Defendants have caused Plaintiff damages and lost business opportunities, in an amount of at least $11 million with respect to the App Game and an additional amount to be determined at trial for the Film and the damaged reputation.

233.    Defendants had a meeting of the minds regarding the numerous misrepresentations they made about Plaintiff—that it had no contract or business relationship with Trejo, that it was a fraud and its principal was a con man, that Wozniak was engaged in illegal activity by working with Plaintiff, and other such representations as set forth herein—to accomplish their improper objectives.

234.    Defendants committed one or more unlawful acts in their scheme by placing the telephone call to Wozniak, at least once, and making the defamatory statements that intentionally interfered with Plaintiff's Utah-based business, by placing at least one telephone call to Danon Jones and threatening his business, and other acts to be uncovered during discovery.

235.    Plaintiff has been injured by Defendants' conspiracy in an amount to be proven at trial.

236.    The act of wrongfully threatening, coercing, and extorting Plaintiff's business partners through force or the appearance of force constitutes an unlawful and improper means.

237.    Defendants' wrongful acts were intentional, active, egregious, and willful.

238.    As a direct and proximate result of Defendants' conspiracy, Plaintiff has been damaged in an amount to be proven at trial along with punitive damages.

**TENTH CAUSE OF ACTION**

***Respondeat Superior/Vicarious Liability (All Defendants)***

239.    Plaintiff incorporates by this reference the allegations set forth above as if fully set forth herein.

240.    The Defendants are liable for the acts of their agents acting within the scope of their authority.

241.    Hinojosa acted on behalf of herself and the Talent Agency to commit the wrongful acts as set forth herein.

242.    Defendants, as production companies and distributors of various films, acted within their scope of authority as agents to the films they represent.

243.    Defendant Rodriguez acted within his scope of authority as an agent for his affiliated entities and business partners.

244.    Defendants substantially controlled the improper actions of their individual agents Hinojosa and Rodriguez with which they are associated in improperly using Plaintiff's Property.

245.    Defendants are jointly and severally liable because the injuries they caused are indivisible and the tortfeasors acted in concert, *i.e.*, by agreement.

**ELEVENTH CAUSE OF ACTION**

***Constructive Trust (All Defendants)***

246.    Plaintiff realleges and incorporates by reference the allegations contained in the above paragraphs of the Complaint as though set forth fully herein.

247.    Defendants have wrongfully obtained and received possession and control of Plaintiff's Property, *i.e.*, the name, likeness, image, voice, signature, and endorsement of Danny

Trejo, through Defendants' wrongful acts, misrepresentations, and omissions.

248.     Defendants have wrongfully obtained and received possession and control over funds that are the direct and traceable result of misuse of Plaintiff's Property.

249.     Defendants will be unjustly enriched if permitted to retain possession and control of Plaintiff's Property and funds that were improperly derived from Plaintiff's Property. In particular, Defendant Rodriguez and his affiliated entities and partners related to *Machete Kills* are ramping up promotional efforts for their film prominently featuring Plaintiff's Property with a set release date in September 2013.

250.     Without a constructive trust over *Machete Kills* and any profits or proceeds derived therefrom, Defendants will be unjustly enriched through distribution revenue because of their unlawful exploitation of Plaintiff's Property.

251.     The Court should therefore impose a constructive trust with respect to any and all materials that use Plaintiff's Property, including the film *Machete Kills* and all promotional materials in it that use Trejo's name, likeness, image, voice, signature, and endorsement; including but not limited to, the funds improperly derived from their improper use of Plaintiff's Property.

252.     The Plaintiff is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

A.     In accordance with Plaintiff's causes of action, for a judgment against Defendants in an amount to be determined at trial, together with the value of interest, costs, and attorneys'

fees, and punitive damages in an amount no less than $11 million.

> B.       For a preliminary and permanent injunction and restraining order enjoining and restraining Defendants from releasing its products currently in production that contain Plaintiff's Property Rights.

> C.       For actual and special damages in an amount to be determined at trial;

> D.       For consequential damages in an amount to be determined at trial;

> E.       For punitive damages in an amount to be determined at trial;

> F.       For prejudgment and post judgment interest;

> G.       For Plaintiff's attorneys' fees and costs; and

> H.       For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable to a jury as a matter of right.


DATED: June 6, 2013.

PIA ANDERSON DORIUS REYNARD & MOSS


/S/ Joseph G. Pia
Joseph G. Pia
Tyson B. Snow
Sara E. Payne
*Attorneys for Plaintiff*

42